## ALLEN et al v. INDUSTRIAL COMMISSION et al.

No. 6918.   Decided September 17, 1946.   (172 P. 2d 669.)

See 71 C. J., Workmen's Compensation Acts, sec. 46; 28 R. C. L. 725;. Extra territorial operation of Workmen's Compensation Statutes, see notes 3 A. L. R. 1347; 18 A. L. R. 292; 28 A. L. R. 1345; 35 A. L. R.. 1414; 45 A. L. R. 1234; 59 A. L. R. 735; 82 A. L. R. 709; and 90 A. L. R.. 120.

*E. LeRoy Shields* and *Moyle, McKay, Burton & White,* all of Salt Lake City, for plaintiffs.

*Grover A. Giles,* Atty. Gen., *Arthur H. Nielsen,* Asst. Atty. Gen., and *Jensen & Jensen,* of Nephi, for defendants.

WADE, Justice.

This matter comes to this court on a writ of certiorari to review an award by the Industrial Commission to the dependents of Bernell C. Cooper, deceased, under the Workmen's Compensation Act. The dependents claim that his death was caused by an accidental injury suffered in the course of his employment by the Allen Cash Stores at Caliente, Nevada, between the 8th of June and the 11th of July, 1944. Three questions are presented: (1) Does the Utah State Industrial Commission have jurisdiction to make an award in a case of this kind? (2) Is the evidence sufficient to sustain a finding that the deceased was injured in the course of his employment? (3) Is the evidence sufficent to sustain a finding that his death was caused by an injury?

The Allen Cash Stores are owned and operated by George Allen and J. P. Allen, doing business under that name. They reside and have their headquarters from which they handle the general business of their stores at Tooele, Utah. They operate stores at Tooele and Nephi, Utah, and at Caliente and Pioche, Nevada. The deceased during the times covered by this case was a resident of Nephi, Utah.

About June 18, 1944, deceased at Nephi, Utah, agreed to go to work in the Allens' store at Caliente, Nevada, as a meat cutter. On June 22d, he commenced work for them at that place, and continued in such employment until July 11th, when he was so ill that he was unable to continue. About July 1st, with the permission of the store management at Caliente he drove a store truck from that city to Nephi,

Utah, with the intention of moving his family to his new place of employment. Incidentally, he brought with him a cash register which he delivered to the store in Nephi. After arriving in Nephi he changed his mind about moving to Caliente and decided to terminate his employment and soon thereafter gave the Allens notice of his intention to terminate his employment on July 15, 1944. However, his wife and a child returned with him to Caliente.

His dependents claim that on June 28th, while in the course of his employment, the knife he was using slipped and cut the index finger of his right hand. They further claim that on July 5th or 6th, while unloading meat he bumped his right leg on the bumper of a car or that a quarter of beef fell from the hook onto his right leg, and badly bruised and broke the skin. After this last injury septicemia set in. On July 10th he consulted a doctor and on July 11th he was suffering great pains in his leg, had a high temperature and was compelled to leave the job before the day was over. The next morning he was taken to Nephi. About 1 o'clock of July 13th, Dr. Beckstead attended him at Nephi. At that time the doctor testified he was suffering severe pains in his leg; his temperature was high but his heart action was not bad. His hemorrhoids were sore and for some time his skin had been colored from yellow jaundice. The doctor administered a sulfa drug and upon returning the next day about the same time found his fever not so high and his pain not so acute. About 4 o'clock later that afternoon after the doctor had gone, to overcome some difficulty he was experiencing in urinating he turned over onto his hands and knees and while in that position collapsed and nearly passed out. The doctor returned immediately and found his patient in a state of severe shock, his heart action and pulse were weak. He died on July 17, 1944.

Was the evidence sufficient to support a finding that deceased was injured in the course of his employment? There was no testimony of any eyewitness as to how or when either of these accidents occurred. Dr. Beckstead testified that deceased told him that while working at the store his knife

slipped and cut his finger. The widow testified that he had no cut when he left to go to Caliente but had it when he returned to Nephi and that from then on she dressed and cared for that wound. Under the reasoning in *Boyd* v. *Industrial Commission*, 88 Utah 184, 53 P. 2d 80, this evidence was probably sufficient to justify the finding that the cut was received in the course of his employment. As will later appear it is not necessary for us to determine that question in this case.

As to how he obtained the bruise on his right leg the application states

"that on or about July 6, 1944, he bumped his right leg on a car bumper, and on or about July 10, 1944, a quarter of beef dropped from a hook in the store onto his right leg badly bruising and breaking the skin thereon."

The evidence on this subject is substantially as follows: Deceased's widow testified that on the evening of July 5th or 6th, he was in considerable pain, that his right leg was badly bruised, and that he did not have that bruise when he went to work that morning, that she treated his bruise, and that he told her that while working at the store during the day a quarter of beef fell from its hook onto his leg and caused the bruise. There was testimony that he made similar statements to the doctor and others after he returned to Nephi. This was the only injury to his leg that these witnesses testify to. Mr. Vowels, the manager of the store at Caliente, on the other hand testified that on July 11th, the last night he was at the store, a load of meat came to the store which the deceased commenced to unload and shortly thereafter deceased came to witness and told him he could not finish unloading the meat because he had bumped his leg on a car bumper while unloading the meat and was therefore unable to finish the job.

The statements by the deceased to his wife and to the doctor relating how he obtained the injury to his leg is hearsay unless they were of aid to the person to whom they were made in treating the same. *Boyd* v. *Industrial*

*Commission,* 88 Utah 184, 53 P. 2d 80. The testimony of the widow to the effect that he did not have the bruise in the morning when he left for work but did have it that night, is of facts within her own knowledge, and tends to prove when the accident occurred and also tends to prove that it occurred in the course of his employment because he spent most of the time during which the accident could have occurred according to that testimony on the job. The testimony of the manager of the store that deceased told him that he could not finish unloading the meat because he had injured his leg by bumping it on the car bumper are words which explained his actions in not finishing the unloading of the meat, and are therefore admissible to prove how the injury occurred. It also is a report of the accident to his employer and being made immediately after the accident, it satisfies the requirements of the statute that such report be made within 48 hours after the accident.

It is true that the application and the findings of the Commission do not harmonize with the testimony of either of these witnesses, and that there is a difference between the testimony of the widow and the doctor on one hand and the testimony of the manager of the store on the other. The application and the findings refer to separate injuries to his right leg, the testimony of the widow and that of the store manager while they differ as to the date of the injury and how it occurred are probably referring to one and the same event. The fact that there was a difference in their versions of what happened does not prove that the trier of the facts must reject both versions or that it must wholly reject one version and wholly accept the other. Nor does it prove that any witness was intentionally giving false testimony. Each of the witnesses may have told the facts according to his recollection. Each witness was probably correct in some details and incorrect in others, and the trier of the facts is at liberty to so find.

Thus the Commission, from this evidence, might reasonably find that the accident happened on the 6th of July or the 11th, that it resulted from bumping his leg on the car

bumper or that a quarter of meat fell onto his leg in the course of his employment, and that at the time when it happened the deceased immediately reported it to the manager of the store. Thus the evidence was sufficient to justify the Commission's finding that the accident arose out of and occurred in the course of his employment.

Was the evidence sufficient to justify a finding that the death of the deceased was caused by these injuries? Three doctors testified that in their opinion death was the result of septicemia in the blood stream which attacked the bruise on his leg and caused the blood clots therein to get into the blood stream and when he turned over onto his hands and knees it caused a pulmonary embolism or thrombo phlebitis or thrombosis which ultimately caused his death. They testified that in their opinion the septicemia came into the blood stream through the break in the skin at the bruise on his leg or from the cut on his finger. They admitted that there was a remote possibility, which was very improbable, that the septicemia came through the hemorrhoids or some other source, but without the bruise on his leg it would be very unusual for it to cause his death, and if it did it would have taken a much longer time. From this evidence the Commission could have reasonably found that the septicemia entered his body through the bruise on his leg or the cut on his hand, and under such finding the award must be upheld. Counsel argues at length and in great detail that the opinions of the doctors are positively contrary to well established medical facts. His arguments sound somewhat plausible and would require consideration if we were the trier of the facts. But certainly we cannot say as a matter of law that it would be unreasonable for the Commission to find the cause of death in accordance with the undisputed medical opinions.

Counsel further argues that the opinions of the doctors were not based on all the facts which were disclosed by the evidence and therefore are of no value in determining the cause of death. We have carefully read and checked the

testimony and are satisfied that all of the facts as disclosed by the evidence which have a bearing on the cause of death were called to the attention of the doctors and were discussed and considered by them in giving their opinions. It is true that counsel draws some inference from the facts as disclosed by the evidence which were not discussed by the doctors. But counsel had the opportunity to cross-examine and did not call such inferences to the attention of the doctors. Counsel also had the opportunity to produce other doctors, if such he could find, to give opinions in accordance with his argument but did not do so. The evidence was ample to sustain the findings of the Commission.

Did the Utah Industrial Commission have jurisdiction to make an award in this case? The contract of hire was entered into in Utah between citizens of this state but the work to be done thereunder was to be performed in Nevada. The only work which was done in this state ■ . under that contract was the bringing of a cash register or adding machine from Caliente to Nephi in the company's truck and delivering it to the Nephi store. The answer to this question depends on the construction of the Workmen's Compensation Laws of this state. Sec. 42-1-43, U. C. A. 1943, provides:

"Every employee mentioned in section 42-1-41 who is injured, and the dependents of every such employee who is killed by accident arising out of or in the course of his employment, wheresoever such injury occurred, provided the same was not purposely self-inflicted, shall be entitled to receive, and shall be paid, such compensation for loss sustained on account of such injury or death, and such amount for medical, nurse and hospital services and medicines, and, in case of death, such amount of funeral expenses, as is herein provided."

Section 42-1-52 provides:

"If an employee who has been hired or is regularly employed in this state receives personal injury by accident arising out of and in the course of such employment outside of this state, he, or his dependents in case of his death, shall be entitled to compensation according to the law of this state. This provision shall apply only to those injuries received by the employee within six months after leaving this state,

unless prior to the expiration of such six months period the employer has filed with the industrial commission of Utah notice that he has elected to extend such coverage a greater period of time."

The employee mentioned in Section 42-1-41 is clearly covered by the facts in this case. Section 42-1-43 requires the payment of compensation to the dependents of *every employee* who is killed by accident arising out of or in the course of his employment, *wheresoever such injury occurred.* The statute contains no express limitations as to time and place of services and seems to indicate thereby an intention to cover a broad field. Then follows Section 42-1-52. It provides for compensation to the dependents of an employee who is killed by accident in the course of his employment "who has been hired or is regularly employed in this state." It is hard to conceive a language that would more accurately express this situation than that. It expressly provides for compensation if the employee *has been hired* within this state even though the accident occurs outside of the state. If the words "has been hired" are to be given their ordinary meaning then all that is necessary to bring a case within the provisions of our statute is that the contract of employment be entered into within this state. The terms of the statute are "has been hired," indicating a past event and not a continuing relationship, in contrast with the next provision "is regularly employed" which indicates a continuing relationship within the state. The statute expressly covers not only cases where the status of employment is localized within the state, that is regularly employed here, but also covers cases where the contract of employment has been entered into in the state and the services are to be performed outside of the state. If it were intended to cover only cases where the status of employment is localized in the state then the provision that "an employee who has been hired  *  *  *  in this state" would mean nothing in the statute, because all such cases would be covered by the provision that an employee who is regularly employed in this state is covered by the statute.

The next provision expressly limits to a period of six months the time during which an employee is entitled to compensation under our laws after leaving the state except in cases where the employer elects to extend such period. If an employee was continuously employed outside of the state for a period of six months during which time he did not enter the state, he could not be regularly employed within this state and so the statute clearly covers cases where the status of employment is not localized within this state, unless by the history of this statute and the purpose of its enactment we are required to give it an unusual meaning.

Counsel contends that our previous decisions of *Buckingham Transportation Co.* v. *Industrial Commission,* 93 Utah 342, 72 P. 2d 1077; *Fay* v. *Industrial Commission,* 100 Utah 542, 114 P. 2d 508; and *Buhler* v. *Maddison,* 105 Utah 39, 140 P. 2d 933, require us to hold that the only cases which come within this statute are those where the status of employee-employer relationship is localized in this state. The cases referred to are cases which construe the statute as it was in Sec. 42-1-52, R. S. U. 1933, prior to the amendment which took effect May 13, 1941, which as far as applicable to this case reads as follows:

"If *a workman* who has been hired in this state receives personal injury by accident arising out of *or* in the course of such employment, he shall be entitled to compensation according to the law of this state, *even though such injury was received outside of this state * * *.*" (Emphasis is ours and is added to indicate the parts which have been changed by the amendment.)

The amendment substituted for the words "a workman" the words "an employee," for the word "or" the word "and" and after the word "employment" were inserted the words "outside of this state" instead of the italicized words at the end of the sentence. There was also omitted another entirely different sentence from the previous law, and in the amendment was added the last sentence of the 1943 statute as above quoted. The difference which we wish to call

special attention to is that before the amendment it provided that:

"If *a workman* who has been hired in this state   *   *   *";

whereas, since the amendment it provides that:

"If *an employee* who has been hired or is regularly employed in this state   *   *   *."

Appellants contend that in the Buckingham and Fay cases, supra, we construed the words "a workman who has been hired in this state" to mean "where the status of employer and employee [has been] localized [within] this state" [100 Utah 542, 114 P. 2d 510] or "an employee who is   *   *   * regularly employed in this state." That under this construction before the Industrial Commission of Utah can acquire jurisdiction to make an award in an industrial accident case the status of employer and employee must be localized, or the employee must be regularly employed in this state. They further contend that the amendment was made after the decisions in the above cases and such amendment was merely an adoption of the construction placed upon this provision in those cases. And that therefore, since the status of employee and employer was not localized nor the employee regularly employed in this state, the Industrial Commission of Utah had no jurisdiction to make an award.

In the Buckingham case, supra, the contract of employment was entered into in Colorado where both parties thereto resided, and thereupon the employee was sent to Utah, and thereafter made his home and headquarters at Salt Lake City and drove a truck from that city to Rawlins, Wyoming, and while so engaged was injured at Morgan, Utah. In upholding an award by the Utah Industrial Commission, we said that our act is one affecting the status of employer and employee, that the right to recover does not depend at all upon the reading into the contract of employment the law of Colorado where the contract was made. Citing Sec. 42-1-52, R. S. U. 1933. However, that section has no bearing on

the question involved in that case because it only deals with cases where the accident occurred outside of the state, so any consrtuction we placed on that section was dicta.

In the Fay case, supra, the contract of employment was probably made in Ohio, where both parties then resided; the employee was later transferred to California and later to Utah, where he had his headquarters and resided in Salt Lake City and from there worked the surrounding states. He was killed in an auto accident while in the course of his employment in Idaho. We sustained the award to his dependents, citing the Buckingham case, supra, and construing Sec. 42-1-52, R. S. U. 1933. We held that the status of employer and employee being localized in this state, the case came within the provisions of that section, nothwithstanding the wording of the statute was limited to "a workman who has been hired in this state." There the accident occurred outside of the state so Sec. 42-1-52 R. S. U. 1933 squarely covered the case. Some of the discussion in the case indicated a construction of the statute so as to exclude from the operation thereof a case where as here the contract of employment was made in this state but the status thereof was not localized here. That question was not then before us and what we said on that subject is not here binding.

Counsel is mistaken when he claims that that decision was made prior to the amendment. The amendment went into effect May 13, 1941, and the decision was rendered June 18, 1941, so the legislature did not indicate thereby an approval of the construction therein placed on that section. So there is nothing about the history of this enactment which requires us to give it a construction which is clearly contrary to its obvious meaning. The case of *Buhler* v. *Maddison,* supra, also does not help appellant as we merely there held that it was not necessary for us to pass on this question.

Nor is counsel's contention, to the effect that since our statute deals with the status of employment and is not dependent on reading into the contract of employment the provisions of the statute of the state where it was

entered into, the statute of such a state cannot cover ∎ a case where the status of employer and employee is not localized within the state. The entering into a contract of employment within the state between residents and citizens thereof creates the relationship of employer and employee, although the same is not localized within this state, which is sufficient to give this state jurisdiction to regulate that relationship. This state is interested in providing this protection to its residents and citizens. *Alaska Packers Association* v. *Industrial Accident Commission,* 294 U. S. 532, 55 S. Ct. 518, 79 L. Ed. 1044. It is not necessary for us to here decide whether this state would have jurisdiction if the contract was entered into within this state but the parties or either of them were not residents or citizens of this state. We therefore express no opinion thereon.

Award of the Commission is affirmed.

LARSON, C. J., and McDONOUGH and PRATT, JJ., concur.

WOLFE, Justice.

I am compelled to concur with the reasoning of the opinion as to the meaning of Section 42-1-52 as amended. The section as amended may introduce some difficulties into the administration of our law. Our act requires the employer to insure the payment of compensation. If a labor scout for a domestic or foreign employer hired transients or residents in this state and sent them to another state such employer would be required to cover the employee in this state for a six-month period after the employee left the state as well as in the state in which the employment became localized at peril of the punitive provisions of Section 42-1-54 if he failed to do so. But in these days it is possible to obtain blanket coverage so much of the difficulty is obviated.

There is a distinct advantage in making the basis of compensation jurisdiction the fact of localization of employment rather than the place of injury or the place of hiring. I think that the basis for the attachment of our compensation jur-

isdiction much less substantial in the case where it attaches because of the mere act of a hiring in this state without the situs of the employment being here than in the case where the event is an injury in this state or where the situs of employment is here, but I am certainly not prepared to say that it is not such an event which will permit our legislature to grant jurisdiction to our Industrial Commission based upon it. I think it sufficient for jurisdiction to attach. I may at a later date, if opportunity offers, have something to say respecting the principles which underlie the assumption of jurisdiction, by a state, of claims of compensation arising by reason of accidents in another state. It would appear that by the amendment of May 13, 1941, the legislature must have intended to cover even the case where the employee was hired in this state and his employment was not localized here because it distinctly limited the latter situation to a six-month period as far as the right to recover compensation under our law.

If other states have laws like ours an injured employee will have the option of claiming compensation in the state where he was injured, or where he was hired or in the state where the situs of the relationship is localized. But that results from the fact that we have a dual system of government with forty-eight sovereignties within a sovereignty.